**STATE of Missouri, Respondent,**

v.

**Elsie Mae LASPY, Appellant.**

No. 46604.

Supreme Court of Missouri,

Division No. 2.

April 13, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied May 11, 1959.

Rufus Burrus, Independence, for appellant.

John M. Dalton, Atty. Gen., W. Don Kennedy, Asst. Atty. Gen., for respondent.

LEEDY, Judge.

Elsie Mae Laspy (hereinafter referred to as defendant) appeals from a judgment convicting her of manslaughter in having shot and killed her husband, Julius, and by which she was sentenced to a term of ten years' imprisonment in the penitentiary in accordance with the verdict. She has been thrice convicted under the instant information (two times for second degree murder, and currently for manslaughter), and this is her second appeal. See 298 S. W.2d 357 for a more complete statement of the facts than is deemed necessary to a determination of the questions raised by the points now urged for reversal, which points relate (1) to the admissibility of a written statement given to the police while defendant was in custody; (2) the refusal of the court to instruct on the subject of such statement in certain particulars as requested by defendant; (3) the exclusion of proffered exhibits; and (4) the failure of the court to grant a new trial because of certain newspaper publicity.

Defendant admittedly killed her husband about 6:15 A.M., on January 1, 1955, by shooting him with a pistol. Her defense was self-defense. The killing occurred at their home in Independence while an all-night New Year's party was in process of breaking up. At least some of the guests were still present. The one eyewitness who testified on the part of the state was one of these guests. The killing seems to have grown out of the husband's resentment over the failure of defendant to lock the bathroom door when she entered therein, but we need not concern ourselves with any of the facts except those having relevancy to the questions presented on this appeal, and for that reason we omit the circumstances surrounding the homicide itself.

Immediately after the shooting she went to the home of neighbors where, following an unsuccessful effort on her own part to call the police, someone at the neighbors' home put the call through, and the police came. The chief of police arrived about 6:45, and Officers Crownover and Wingate and Sergeant Hayden were already there. Defendant told the chief that she had killed

her husband, and informed Officer Crownover where the gun would be found, and it was recovered. After brief questioning at the home, defendant was taken to police headquarters in Independence, arriving about 7 o'clock. There she gave a statement (in question and answer form) to the police which was subsequently received in evidence on the part of the state. As indicated above, the question of its admissibility is one of the live questions on this appeal, this in the light of the objections offered at the trial and preserved in the motion for new trial. At defendant's request, the court held a preliminary investigation out of the presence of the jury on that question, at which defendant did not testify or offer any evidence, the only evidence being that of the state's witness Officer Mikulich, whose testimony was in substance: That defendant was questioned by Officers Crownover and Wingate; the witness reduced the questions and answers to writing, his role being exclusively that of typist; that they started taking the statement about 7:40 A.M. (within little more than half an hour after arriving at headquarters), and completed the same in an hour or an hour and a half. Crownover and Wingate were no longer connected with the police department. The statement was taken in the records room of police headquarters. Present were Crownover, Wingate, the defendant and the witness. The chief of police came into the room momentarily while the statement was being taken—he was in and out. Everyone was seated. Crownover advised defendant that she did not have to give the statement, and if she did give it, it was of her own free will and accord, knowing that it might be used for or against her in a court of law (and this also appears in mimeograph form on the face of her written statement). The witness further testified that Crownover also advised the defendant that she was entitled to have friends and an attorney present. (On cross-examination the witness admitted that at the former trial he may not have

testified as to this particular feature.) He also testified that no threats or promises were made—in short, no type of coercion was used. Such was the state of affairs when the statement was offered in evidence.

▄▄▄ We consider separately the several objections to its admission, the first of which was that the statement was not shown to have been "entirely voluntary." The objection apparently concedes that the statement was partly voluntary but not entirely so. The latter claim is based on the fact that other testimony showed the defendant had been up all night at the New Year's party and had been in custody from 6 o'clock until the time the statement was taken, and not accorded an opportunity to rest, and she had no will to resist, nor was she able to determine what her answers were, or if, in fact, she had been asked any questions. In the absence of facts whereon to base the latter part of the objection (as was the case), it would have been the rankest kind of error to have excluded the statement on such grounds, and the mere fact defendant had been up all night at a New Year's party would not, of itself, render her statement involuntary.

▄▄▄ The next objection urged against the admissibility of the statement is that "defendant was not shown to have been aware of, nor had she knowingly waived her constitutional right under Section 19 of Article I of the Missouri Constitution, V.A.M.S., and under the Fifth Amendment to the Constitution of the United States, to remain silent, and not be compelled to give testimony which might tend to incriminate herself and be compelled to testify against herself in a criminal case." This is not a valid objection for a variety of reasons. In the first place, it is made in the teeth of the state's contrary showing by the witness Mikulich, but, for present purposes, disregarding his testimony on the subject of advising defendant that she was not required to give the statement, and

warning her in that regard, there being nothing to impeach the voluntariness of the statement (the state's showing in that regard having been sufficient to at least make it a jury question), "the fact that the officer did not caution or warn the accused that it might be used against him does not render the confession inadmissible." State v. Hoskins, 327 Mo. 313, 317, 36 S.W.2d 909, 910; State v. Evans, 345 Mo. 398, 406, 133 S.W.2d 389, 393; State v. Johnson, 316 Mo. 86, 92, 289 S.W. 847, 849.

 It is further contended that the confession was rendered inadmissible as a matter of law under the Sixth Amendment to the Constitution of the United States, and under § 18(a) of Article I of the Missouri Constitution, in that defendant was not shown to have been aware of and to have understood her right under those sections to have the assistance of counsel for her defense before giving such purported statement, nor did she waive the same. We disregard so much of the foregoing claim as involves the Sixth Amendment to the Constitution of the United States, this because such amendment applies only to trials in the federal court and has no application to a prosecution such as this which was brought in a court of one of the several states. State v. Mischanko, Mo., 272 S.W. 2d 210, 214. What was said in reference to the claimed violation of the other constitutional right (last above treated) is equally applicable to the claim asserted under § 18 (a) of Article I of the Missouri Constitution. As heretofore noted, there was evidence to the effect that defendant was orally advised of her right to counsel, but whether she was or was not is immaterial because the constitutional guaranty of the right to appear and defend by counsel under § 18(a), supra, has never been interpreted as requiring that a suspect be advised of that right as a condition to his making a voluntary statement or confession. In Commonwealth v. McNeil, 328 Mass. 436, 104 N.E.2d 153, 155 (a decision of the Supreme Judicial Court of Massachusetts), the contention

was that defendant's confession was inadmissible because "he was not advised, prior to the procurement of the confession, of his right to the assistance of counsel." In denying such contention, the court said: "At the time the confession was made the defendant had not been brought into any court. There is nothing in the statutes of Massachusetts giving a person accused of a capital crime or any other crime a right to counsel before being brought into court. * * * No decision of the Supreme Court of the United States has been cited to us, and we have found none, holding that a State owes a constitutional duty to provide counsel for one accused of murder prior to his being brought into court. In the recent case of State v. Bunk, 4 N.J. 461, 470, 73 A.2d 249, 19 A.L.R.2d 1316, it was held that a confession made before the accused had counsel was admissible." In that connection, the Bunk case, supra (73 A.2d loc. cit. 254, 19 A.L.R.2d loc. cit. 1324), says this: "In answer to the argument that the defendants were not advised of their rights and privileges the law over the years in this State has been that a person is only entitled to counsel to aid him in his defense, not to save him from his own voluntary acts * * *." See, also, Leick v. People, 136 Colo. 535, 322 P.2d 674, 675, 684, which is to the same effect. Defendant's contention is overruled.

 What we have said above necessarily disposes of the further claim of error in the refusal of defendant's instructions A and B. These instructions would have told the jury that defendant's written statement could only be competent if the defendant had in fact been advised and knew her constitutional right to remain silent, to be represented by an attorney, and thereafter to have knowingly and understandingly waived such rights. Even if the statement had been erroneously admitted, such error would have been cured by reason of the fact that when defendant took the stand she related the very same facts as those incorporated in her written statement, and particularly those supporting her plea of

self-defense. In only two particulars has it been pointed out wherein there was any difference between her statement and her oral testimony, and these were not of major significance and hence need not be discussed.

■■■■ The defendant sought unsuccessfully to introduce in evidence the following documentary evidence: (1) A photograph of deceased in the garb and bearing a serial number of the Kansas State Penitentiary; (2) a duly authenticated copy of the records of the District Court of Leavenworth County, Kansas, showing his conviction on March 8, 1935, for the offense of "grand larceny of stealing domestic fowls in the nighttime," and sentencing him to confinement at hard labor in said penitentiary, and (3) a copy of a letter purporting to have been written by the record clerk at the Kansas Penitentiary showing the defendant was received therein under sentence from the District Court of Leavenworth County, Kansas, "4–8–35 from Leavenworth County; sentenced to a term of from 1 to 5 years from the crime of grand larceny; was paroled 3–25–36 and discharged from parole 1–20–39." In connection with these offers the defendant also offered to prove by the defendant "that deceased had told her that he had served time in the penitentiary and he didn't mind killing somebody else." (She had previously testified, without objection, that deceased told her "he had been in the State Penitentiary at Lansing," and that "he would just as soon kill me as anybody else because he had already killed a man before, and he wouldn't mind killing me.") These offers were on the theory that such proof would be corroborative of what he had told her. Both offers were denied. The latter of the two offers would have to be denied on the ground (if no other) that the substance of the proof thereby offered had already been received in evidence. But in no event would proof of the former conviction have been competent under this record except on the issue of self-defense as affected by defendant's apprehension of danger because of the turbulent or violent disposition or character of the deceased, and a conviction for stealing chickens would not go to that question; hence there was no error in denying the offers.

So much of the final point as has been briefed by appellant is based on the following portion of ground IX of the motion for new trial: "Because the verdict of the jury was the result of or was improperly influenced by a story published in the Kansas City Times of 9 June, a copy of which is hereto attached and made a part of this motion, for the reason the said story recited the results of conviction on the two prior trials of the defendant, all of which resulted in the defendant's not having a fair and impartial trial."

■■■ The transcript discloses that after the jury was sworn, but before the introduction of any testimony, defendant's counsel produced and called the court's attention to the offending newspaper story, and stated, among other things: "I don't know exactly what action, if any, ought to be taken, but I do want the court to know it. * * * I rather assume that jurors of ordinary intelligence read the newspaper, and at least a few of them would have probably read this story, and at the present time I don't know whether to say we ought to ask for a mistrial." The court indicated that whatever action was to be taken would have to be done "pretty quickly"—"We either have to go ahead with the trial or we don't." Counsel for defendant then continued as follows: "I have my time budgeted and I haven't got another period of time without disrupting other things that I have set. * * * I just don't like to be put in the position to have to ask for it, and that is the reason I haven't made up my mind to do anything more. We might ascertain from the jurors afterward whether it had any effect on them, and that is about the only thing I could suggest. * * * I am just leaving it to the court's discretion as to what happened, if there hasn't anything happened." It will thus be seen that defendant's counsel was unwilling to re-

quest that a mistrial be declared, but was content to take his chances on the outcome, with the possibility (in the event of conviction) of inquiring into any adverse effect the news item may have had on the jurors. (No such subsequent inquiry was made, or attempted to be made, nor would the court have been warranted in entering upon any such inquiry.) In the situation above outlined, the court will not be held to have abused its discretion in doing that which counsel was perfectly willing to have, and was, done.

No reversible error appears in those parts of the record which we examine under Rule 28.02, 42 V.A.M.S., irrespective of whether error thereon is assigned.

The judgment is affirmed.

All concur.